# UNITED STATES DISTRICT COURT

**FILED**

for the

Eastern District of California

JAN -6 2016

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY_____
DEPUTY CLERK

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| | ) | Case No. |
| | ) | |
| | ) | 2:16 - MJ - 3            EFB |
| | ) | |
| Ivan Louis Sebastian Ramirez | ) | |
| *Defendant(s)* | | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of     January 1, 2014, to January 6, 2016     in the county of          El Dorado          in the

Eastern     District of     California     , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 2251 | Sexual Exploitation of Children |
| 18 U.S.C. § 2252 | Certain Activities Relating to Material Involving the Sexual Exploitation of Minors |
| 18 U.S.C. § 2252A | Certain Activities Relating to Material Constituting or Containing Child Pornography |

This criminal complaint is based on these facts:

(see attachment)

☒  Continued on the attached sheet.

_L.H. Jones_
*Complainant's signature*

L.H. Jones, Special Agent, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  1-6-2016

*Judge's signature*

City and state:     Sacramento, CA

Edmund F. Brennan, U.S. Magistrate Judge
*Printed name and title*

1

2

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

3      I, L.H. Jones, Special Agent with the Federal Bureau of Investigation (FBI), being duly sworn,

4   depose and state as follows, to wit:

5                                    **INTRODUCTION**

6   1.      I make this affidavit in support of a criminal complaint for Ivan Louis Sebastian RAMIREZ,

7   currently residing at 6742 West Flynn Lane, Glendale, Arizona 85303.  As explained more fully below,

8   there is probable cause to believe that RAMIREZ has committed violations of Federal law, including

9   violations of 18 U.S.C. §§ 2251(a), 2252(a)(2), and 2252A(a)(2).

10   2.      The relevant United States Code Sections are as follows:

11      a.  Title 18, United States Code, Section 2251, which makes it a crime to employ, use, persuade,

12   induce, entice, or coerce any minor with the intent that such minor engage in any sexually explicit

13   conduct for the purpose of producing any visual depiction of such conduct or for the purpose of

14   transmitting any live visual depiction of such conduct, if the person knows that the visual depiction will

15   be transmitted using any means or facility of interstate or foreign commerce, or if the visual depiction

16   has actually been transmitted using any means or facility of interstate or foreign commerce or in and

17   affecting interstate or foreign commerce.

18      b.  Title 18, United States Codes, Section 2252(a)(2), which in part makes it a crime for any

19   person to knowingly receive or distribute any visual depiction of a minor engaged in sexually explicit

20   conduct that has been mailed, or has been shipped or transported in interstate or foreign commerce, or

21   which contains materials which have been mailed or so shipped or transported, by any means including

22   by computer, or to knowingly reproduce any visual depiction for distribution in interstate or foreign

23   commerce by any means including by computer or through the mails.

24      c.  Title 18, United States Code, Section 2252A(a)(2), which in part makes it a crime for any

25   person to knowingly receive or distribute any child pornography or material that contains child

26   pornography that has been mailed or that has been shipped or transported in interstate or foreign

27   commerce by any means including by computer.

28

3.   I am a Special Agent with the FBI assigned to work violations involving crimes against children. I have been employed with the FBI as a Special Agent since 2005.  I have received education and training for numerous criminal violations including healthcare fraud, financial fraud, cyber crimes, and crimes against children.  As a Special Agent I have been the affiant and case agent on numerous federal and state investigations.

4.   I am familiar with the information contained in this Affidavit based upon the investigation I have conducted and based upon conversations with other law enforcement officers who have engaged in numerous investigations involving child pornography.  I am a law enforcement officer with authority to execute arrest and search warrants under the authority of the United States.

5.   Since this Affidavit is being submitted in support of a criminal complaint for RAMIREZ, I have set forth only the facts that I believe are necessary to establish probable cause to believe that RAMERIZ has violated federal law.  Where statements of others are set forth in this Affidavit, they are set forth in substance and in part.

## DEFINITIONS

6.   The following non-exhaustive list of definitions applies to this:

a.  "Child Pornography" is any visual depiction of sexually explicit conduct where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct, (b) the visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct, or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct. *See* 18 U.S.C. § 2256(8).

b.  "Child Erotica" means materials or items that are sexually arousing to persons having a sexual interest in minors, but that are not, in and of themselves, obscene or illegal.  In contrast to "child pornography," this material does not necessarily depict minors in sexually explicit poses or positions.  Some of the more common types of child erotica include photographs that are not sexually explicit, drawings, sketches, fantasy writing, and diaries. *See Kenneth V. Lanning, Child Molesters: A Behavioral Analysis* (2001) at 65.  Federal courts have recognized the evidentiary value of child erotica and its admissibility in child pornography cases. *See United States v. Cross*, 928 F.2d 1030 (11th Cir.

2

1   1991) (testimony about persons deriving sexual satisfaction from and collecting non-sexual photographs

2   of children admissible to show intent and explain actions of defendant); *United States v. Riccardi*, **258**

3   F.Supp.2d 1212 (D. Kan., 2003) (child erotica admissible under Federal Rule of Evidence 404(b) to

4   show knowledge or intent).

5         c. "Visual depictions" include undeveloped film and videotape, and data stored on computer

6   disk or by electronic means, which is capable of conversion into a visual image. *See* 18 U.S.C. §

7   2256(5).

8         d. "Minor" means any person under the age of eighteen years. *See* 18 U.S.C. § 2256(1).

9         e. "Sexually explicit conduct" means actual or simulated (a) sexual intercourse, including

10  genital-genital, oral-genital, or oral-anal, whether between persons of the same or opposite sex; (b)

11  bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the genitals

12  or pubic area of any person. *See* 18 U.S.C. § 2256(2).

13        f. "Computer" means "an electronic, magnetic, optical, electrochemical, or other high speed

14  data processing device performing logical or storage functions, and includes any data storage facility or

15  communications facility directly related to or operating in conjunction with such device." *See* 18 U.S.C.

16  § 1030(e)(1).

17        g. "Computer hardware" consists of all equipment which can receive, capture, collect, analyze,

18  create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses

19  or data. Computer hardware includes any data-processing devices (including central processing units,

20  internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and

21  diskettes, and other memory storage devices), peripheral input/output devices (including keyboards,

22  printers, video display monitors, and related communications devices such as cables and connections),

23  as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware

24  (including physical keys and locks).

25        h. "Computer software" is digital information which can be interpreted by a computer and any

26  of its related components to direct the way they work. Computer software is stored in electronic,

27  magnetic or other digital form. It commonly includes programs to run operating systems, applications

28  and utilities.

AFFIDAVIT IN SUPPORT OF CRIMINAL
COMPLAINT

3

1    i. "Computer-related documentation" consists of written, recorded, printed, or electronically
2  stored material which explains or illustrates how to configure or use computer hardware, computer
3  software or other related items.

4    j. "Computer passwords and data security devices" consist of information or items designed to
5  restrict access to or hide computer software, documentation or data. Data security devices may consist
6  of hardware, software or other programming code. A password (a string of alpha-numeric characters)
7  usually operates a sort of digital key to "unlock" particular data security devices. Data security
8  hardware may include encryption devices, chips and circuit boards. Data security software of digital
9  code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-
10  set security functions when touched. Data security software or code may also encrypt, compress, hide or
11  "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to
12  restore it.

13    k. "Internet Service Providers" (ISPs) are commercial organizations, which provide
14  individuals and businesses access to the Internet. ISPs provide a range of functions for their customers
15  including access to the Internet, web hosting, e-mail, remote storage and co-location of computers and
16  other communications equipment. ISPs can offer various means to access the Internet, including
17  telephone based dial-up, broadband based access via a digital subscriber line (DSL) or cable television,
18  dedicated circuits, or satellite based subscription. ISPs typically charge a fee based upon the type of
19  connection and volume of data, called bandwidth that the connection supports. Many ISPs assign each
20  subscriber an account name such as a user name or screen name, an e-mail address, and an e-mail
21  mailbox and the subscriber typically creates a password for the account. By using a computer equipped
22  with a telephone or cable modem, the subscriber can establish communication with an ISP over a
23  telephone line or through a cable system, and can access the Internet by using his or her account name
24  and password.

25    l. "ISP Records" are records maintained by ISPs pertaining to their subscribers (regardless
26  of whether those subscribers are individuals or entities). These records may include account application
27  information, subscriber and billing information, account access information (often times in the form of
28  log files), e-mail communications, information concerning content uploaded and/or stored on or via the

AFFIDAVIT IN SUPPORT OF CRIMINAL          4
COMPLAINT

1  ISP's servers and other information, which may be stored both in computer data format and in written or
2  printed record format. ISPs reserve and/or maintain computer disk storage space on their computer
3  system for their subscribers' use. This service by ISPs allows for both temporary and long-term storage
4  of electronic communications and many other types of electronic data and files.

5      m. "Internet Protocol address" (IP address) refers to a unique number used by a computer to
6  access the Internet. IP addresses can be dynamic, meaning that the Internet Service Provider (ISP)
7  assigns a different unique number to a computer every time it accesses the Internet. IP addresses might
8  also be static, if an ISP assigns a user's computer a particular IP address which is used each time the
9  computer accesses the Internet.

10      n. The terms "records," "documents" and "materials" include all information recorded in any
11  form, visual or aural, and by any means, whether in hand-made form (including writings, drawings,
12  painting), photographic form (including microfilm, microfiche, prints, slides, negatives, videotapes,
13  motion pictures, photocopies), mechanical form (including phonograph records, printing, typing) or
14  electrical, electronic or magnetic form (including tape recordings, cassettes, compact discs, electronic or
15  magnetic storage devices such as floppy diskettes, hard disks, CD-ROMs, digital video disks (DVDs),
16  Personal Digital Assistants (PDAs), Multi Media Cards (MMCs), memory sticks, optical disks, printer
17  buffers, smart cards, memory calculators, electronic dialers or electronic notebooks, as well as digital
18  data files and printouts or readouts from any magnetic, electrical or electronic storage device).

19      o. "Digital device" includes any electronic system or device capable of storing and/or processing
20  data in digital form, including the following: central processing units; laptop or notebook computers;
21  PDAs; wireless communication devices such as telephone paging devices, beepers and mobile
22  telephones; peripheral input/output devices such as keyboards, printers, scanners, plotters, monitors and
23  drives intended for removable media; related communications devices such as modems, cables and
24  connections; storage media such as hard disk drives, floppy disks, compact disks, magnetic tapes and
25  memory chips; and security devices.

26      p. "Image" or "copy" refers to an accurate reproduction of information contained on an original
27  physical item, independent of the electronic storage device. "Imaging" or "copying" maintains contents,
28  but attributes may change during the reproduction.

AFFIDAVIT IN SUPPORT OF CRIMINAL          5
COMPLAINT

1     q. "Hash value" refers to a mathematical algorithm generated against data to produce a numeric

2     value that is representative of that data.  A hash value may be run on media to find the precise data from

3     which the value was generated.  Hash values cannot be used to find other data.

4     r. "Steganography" refers to the art and science of communicating in a way that hides the

5     existence of the communication. It is used to hide a file inside another.  For example, a child

6     pornography image can be hidden inside another graphic image file, audio file or other file format.

7     s. "Compressed file" refers to a file that has been reduced in size through a compression

8     algorithm to save disk space. The act of compressing a file will make it unreadable to most programs

9     until the file is uncompressed.

10    t. "Domain Name" refers to the common, easy to remember names associated with an Internet

11    Protocol address.  For example, a domain name of www.usdoj.gov refers to the Internet Protocol

12    address of 149.101.1.32. Domain names are typically strings of alphanumeric characters with each

13    level delimited by a period.  Each level, read backwards—from right to left—further identifies parts of

14    an organization.  Examples of first level or top-level domains are typically .com for commercial

15    organizations, .gov for the governmental organizations, .org for organizations, and .edu for educational

16    organizations.  Second level names will further identify the organization  For example, usdoj.gov further

17    identifies the United States governmental agency to be the Department of Justice.  Additional levels may

18    exist as needed until each machine is uniquely identifiable.  For example, www.usdoj.gov identifies the

19    World Wide Web server located at the United States Department of Justice, which is part of the United

20    States government.

21    u. "Log Files" are records automatically produced by computer programs to document electronic

22    events that occur on computers.  Computer programs can record a wide range of events including remote

23    access, file transfers, logon/logoff times, and system errors.  Logs are often named based on the types of

24    information they contain.  For example, web logs contain specific information about when a website was

25    accessed by remote computers; access logs list specific information about when a computer was

26    accessed from a remote location; and file transfer logs list detailed information concerning files that are

27    remotely transferred.

28

1   v. "Hyperlink" refers to an item on a web page which, when selected, transfers the user directly
2   to another location in a hypertext document or to some other web page.

3   w. "Website" consists of textual pages of information and associated graphic images. The
4   textual information is stored in a specific format known as Hyper-Text Mark-up Language (HTML) and
5   is transmitted from web servers to various web clients via Hyper-Text Transport Protocol (HTTP).

6   x. "Uniform Resource Locator" or "Universal Resource Locator" or "URL" is the unique
7   address for a file that is accessible on the Internet. For example, a common way to get to a website is to
8   enter the URL of the website's home page file in the Web browser's address line. Additionally, any file
9   within that website can be specified with a URL. The URL contains the name of the protocol to be used
10   to access the file resource, a domain name that identifies a specific computer on the Internet, and a
11   pathname, a hierarchical description that specifies the location of a file in that computer.

**BACKGROUND ON COMPUTERS AND CHILD PORNOGRAPHY**
**AND ONLINE CHILD EXPLOITATION**

14   7.      Based upon my knowledge, training and experience in online child exploitation and child
15   pornography investigations, as well as the experience and training of other law enforcement officers
16   with whom I have had discussions, I have learned the following:

17   a. Computers and computer technology have revolutionized the way in which child pornography
18   is produced, distributed, stored and communicated as a commodity and a further tool of online child
19   exploitation.

20   b. Individuals can transfer photographs from a camera onto a computer-readable format with a
21   variety of devices, including scanners, memory card readers, or directly from digital cameras.

22   c. Modems allow computers to connect to another computer through the use of telephone, cable,
23   or wireless connection. Electronic contact can be made to literally millions of computers around the
24   world.

25   d. The capability of a computer to store images in digital form makes the computer itself an
26   ideal repository for child pornography. As explained further below, the storage capacity of electronic
27   media used in home computers has increased tremendously within the last several years. These drives
28   can store extreme amounts of visual images at very high resolution.

AFFIDAVIT IN SUPPORT OF CRIMINAL                7
COMPLAINT

1    e. The Internet, the World Wide Web and other Internet components afford individuals many
2    different and relatively secure and anonymous venues for obtaining, viewing and trading child
3    pornography or for communicating with others to do so or to entice children.

4    f. Individuals can use online resources to retrieve, store and share child pornography, including
5    services offered by Internet Portals such as Google, America Online (AOL), Yahoo! and Hotmail,
6    among others. Online services allow a user to set up an account providing e-mail and instant messaging
7    services, as well as electronic storage of computer files in any variety of formats. A user can set up an
8    online storage account from any computer with access to the Internet. Evidence of such online storage
9    of child pornography is often found on the user's computer. And even in cases where online storage is
10   used, evidence of child pornography can be found on the user's computer in most cases.

11   g. As is the case with most digital technology, computer communications can be saved or stored
12   on hardware and computer storage media used for these purposes. Storing this information can be
13   intentional, i.e., by saving an e-mail as a file on the computer or saving the location of one's favorite
14   websites in, for example, "bookmarked" files. However, digital information can also be retained
15   unintentionally, e.g., traces of the path of an electronic communication may be automatically stored in
16   many places (e.g., temporary files or ISP client software, among others). In addition to electronic
17   communications, a computer user's Internet activities generally leave traces or "footprints" in the web
18   cache and history files of the browser used. Such information is often maintained for very long periods
19   of time until overwritten by other data.

20   h. The interaction between software applications and the computer operating systems
21   often results in material obtained from the Internet being stored multiple times, and even in different
22   locations, on a computer hard drive without the user's knowledge. Even if the computer user is
23   sophisticated and understands this automatic storage of information on his/her computer's hard drive,
24   attempts at deleting the material often fail because the material may be automatically stored multiple
25   times and in multiple locations within the computer media. As a result, digital data that may have
26   evidentiary value to this investigation could exist in the user's computer media despite, and long after,
27   attempts at deleting it. A thorough search of this media could uncover evidence of receipt, distribution
28   and production of child pornography.

i. Data that exists on a computer is particularly resilient to deletion. Computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted or viewed via the Internet. Electronic files downloaded to a hard drive can be stored for years at little to no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensic tools. When a person "deletes" a file on a home computer, the data contained in the file does not actually disappear, rather, the data remains on the hard drive until it is overwritten by new data. Therefore, deleted files or remnants of deleted files, may reside in free space or slack space – that is, in space on the hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file. Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or cache. The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed and more on a particular user's operating system, storage capacity, and computer habits.

## BACKGROUND ON CELLULAR PHONE AND CHILD PORNOGRAPHY
## AND ONLINE CHILD EXPLOITATION

8.      Based upon my knowledge, training and experience in online child exploitation and child pornography investigations, as well as the experience and training of other law enforcement officers with whom I have had discussions, I have learned the following:

a. Cellular telephones have revolutionized the way in which child pornography is produced, distributed, stored and communicated as a commodity and a further tool of online child exploitation.

b. A cellular telephone is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A cellular telephone usually contains a "call log," which records the telephone number,

1 date, and time of calls made to and from the phone. In addition to enabling voice communications,
2 wireless telephones offer a broad range of capabilities. These capabilities include: storing names
3 and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-
4 mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing
5 back audio files; storing dates, appointments, and other information on personal calendars; and
6 accessing and downloading information from the Internet. Cellular telephones may also include global
7 positioning system ("GPS") technology for determining the location of the device.

8      c. The capability of a cellular telephone to store images in digital form makes the cellular
9 telephone itself an ideal repository for child pornography. As explained further below, the storage
10 capacity of electronic media used in home cellular telephones has increased tremendously within
11 the last several years. These drives can store extreme amounts of visual images at very high resolution.

12      d. The Internet, the World Wide Web and other Internet components afford individuals many
13 different and relatively secure and anonymous venues for obtaining, viewing and trading child
14 pornography or for communicating with others to do so or to entice children.

15      e. Individuals can use online resources to retrieve, store and share child pornography, including
16 services offered by Internet Portals such as Google, America Online (AOL), Yahoo! and Hotmail,
17 among others. Online services allow a user to set up an account providing e-mail and instant messaging
18 services, as well as electronic storage of cellular telephone files in any variety of formats. A user can set
19 up an online storage account from any cellular telephone with access to the Internet. Evidence of such
20 online storage of child pornography is often found on the user's cellular telephone. And even in cases
21 where online storage is used, evidence of child pornography can be found on the user's cellular
22 telephone in most cases.

23      f. The interaction between software applications and the cellular telephone operating systems
24 often results in material obtained from the Internet being stored multiple times, and even in different
25 locations, on a cellular telephone hard drive without the user's knowledge. Even if the cellular
26 telephone user is sophisticated and understands this automatic storage of information on his/her cellular
27 telephone's storage, attempts at deleting the material often fail because the material may be
28 automatically stored multiple times and in multiple locations within the cellular telephone media. As a

1   result, digital data that may have evidentiary value to this investigation could exist in the user's cellular

2   telephone media despite, and long after, attempts at deleting it. A thorough search of this media could

3   uncover evidence of receipt, distribution and production of child pornography.

## BACKGROUND ON COMPUTERS AND EVIDENCE ASSESSMENT PROCESS IN
## CHILD PORNOGRAPHY AND CHILD EXPLOITATION INVESTIGATIONS

9.      Based upon my knowledge, training, and experience, as well as information related to me by

agents and others involved in the forensic examination of digital devices, I know that segregating

information before commencement of the review of digital evidence by the examining agent is

inconsistent with the evidence assessment process in child pornography and online child exploitation

investigations. This is true in part because the items to be searched will not only contain child

pornography but also will contain the identity of the user/producer of the child pornography as well as

evidence as to the programs and software used to obtain the child pornography.

a.      Although some of the records might be found in the form of user-generated documents (such

as word processor, picture and movie files), computer hard drives can contain other forms of electronic

evidence that are not user-generated. In particular, a computer hard drive may contain records of how a

computer has been used, the purposes for which it was used and who has used these records, as

described further in the attachments. For instance, based upon my knowledge, training and experience,

as well as information related to me by agents and others involved in the forensic examination of digital

devices, I know the following:

i.   Data on the hard drive not currently associated with any file can provide evidence of a

file that was once on the hard drive but has since been deleted or edited, or of a deleted portion

of a file (such as a paragraph that has been deleted from a word processing file).

ii.  Virtual memory paging systems can leave traces of information on the hard drive that

show what tasks and processes the computer were recently in use.

iii. Web browsers, e-mail programs and chat programs store configuration information

on the hard drive that can reveal information such as online nicknames and passwords.

1        iv. Operating systems can record additional information, such as the attachment of

2        peripherals, the attachment of USB flash storage devices and the times the computer was in use.

3        v. Computer file systems can record information about the dates files were created and

4        the sequence in which they were created. This information may be evidence of a crime or

5        indicate the existence and location of evidence in other locations on the hard drive.

6        b. Further, in finding evidence of how a computer has been used, the purposes for which it was

7 used, and who has used it, sometimes it is necessary to establish that a particular thing is not present on a

8 hard drive or that a particular person (in the case of a multi-user computer) was not a user of the

9 computer during the time(s) of the criminal activity. For instance, based upon my knowledge, training

10 and experience, as well as information related to me by agents and others involved in the forensic

11 examination of digital devices, I know that when a computer has more than one user, files can contain

12 information indicating the dates and times that files were create as well as the sequence in which they

13 were created, and, for example, by reviewing the Index.dat files (a system file that keeps track of

14 historical activity conducted in the Internet Explorer application), whether a user accessed other

15 information close in time to the file creation dates, times and sequences so as to establish user identity

16 and exclude others from computer usage during times related to the criminal activity.

17        c. Evidence of how a digital device has been used, what it has been used for and who has used it,

18 may be the absence of particular data on a digital device and requires analysis of the digital device as a

19 whole to demonstrate the absence of particular data. Evidence of the absence of particular data on a

20 digital device is not segregable from the digital device.

21        d. The types of evidence described above may be direct evidence of a crime, indirect evidence

22 of a crime indicating the location of evidence or a space where evidence was once located, contextual

23 evidence identifying a computer user and contextual evidence excluding a computer user. All of these

24 types of evidence may indicate ownership, knowledge and intent.

25        e. This type of evidence is not "data" that can be segregated, that is, this type of data cannot be

26 abstractly reviewed and filtered by a seizing or imaging agent and then transmitted to investigators.

27 Rather, evidence of this type is a conclusion, based on a review of all available facts and the application

28 of knowledge about how a computer behaves and how computers are used.

## CHARACTERISTICS OF INDIVIDUALS INVOLVED IN THE DISTRIBUTION OF CHILD PORNOGRAPHY

10.     Based upon my knowledge, experience, and training in child pornography investigations, and the training and experience of other law enforcement officers with whom I have had discussions, I know there are certain characteristics common to individuals involved in the possession and distribution of child pornography.  Those who possess and distribute child pornography:

a. May receive sexual gratification, stimulation, and satisfaction from contact with children; or from fantasies they may have viewing children engaged in sexual activity or in sexually suggestive poses, such as in person, in photographs, or other visual media; or from literature describing such activity.

b. May collect sexually explicit or suggestive materials, in a variety of media, including photographs, magazines, motion pictures, videotapes, books, slides and/or drawings or other visual media.  Such individuals oftentimes use these materials for their own sexual arousal and gratification.  Further, they may use these materials to lower the inhibitions of children they are attempting to seduce, to arouse the selected child partner, or to demonstrate the desired sexual acts.

c. Often possess and maintain their "hard copies" of child pornographic material, that is, their pictures, films, video tapes, magazines, negatives, photographs, correspondence, mailing lists, books, tape recordings, etc., in the privacy and security of their home or some other secure location.  These individuals typically retain pictures, films, photographs, negatives, magazines, correspondence, books, tape recordings, mailing lists, child erotica, and videotapes for many years.

d. Often maintain their collections that are in a digital or electronic format in a safe, secure and private environment, such as a computer and surrounding area.  These collections are often maintained for several years and are kept close by, usually at the individual's residence, to enable the collector to view the collection, which is valued highly.

e. May correspond with and/or meet others to share information and materials; rarely destroy correspondence from other child pornography distributors/collectors; conceal such correspondence as they do their sexually explicit material; and often maintain lists of names, addresses, and telephone

1 numbers of individuals with whom they have been in contact and who share the same interests in child

2 pornography.

3    f. Prefer not to be without their child pornography for any prolonged time period. This behavior

4 has been documented by law enforcement officers involved in the investigation of child pornography

5 throughout the world.

### FACTS ESTABLISHING PROBABLE CAUSE

6

7 11.    Based upon the above characteristics, as well as the facts detailed below, it is my belief that

8 RAMIREZ has engaged in the receipt and collection of child pornography.

9 12.    In August of 2015, M.G., mother of K.G., contacted law enforcement to report an

10 inappropriate online relationship that her daughter was having with an adult male.

11 13.    K.G. was interviewed and provided that she had met an individual who identified himself as

12 "Louis" on an online game named Animal Jam in August of 2012. As detailed below, investigative

13 steps identified "Louis" as Ivan Louis Sebastian RAMIREZ.

14 14.    K.G. and RAMIREZ had communicated almost every day, only skipping a few days, and never

15 really losing connection. K.G. and RAMIREZ started being together as boyfriend and girlfriend in

16 January of 2015. K.G. was interested in RAMIREZ because he was always there for her. Things were

17 tough for K.G. at school and she lived in a bad neighborhood in Sacramento when they met. In 7th

18 grade, K.G. said she was bullied a lot so she went online and played games to meet other people. In

19 August of last year (2014) K.G. moved to South Lake Tahoe before 8th grade. She liked the new school

20 and the kids were much nicer. K.G. had a new set of friends but she still went online to play games and

21 communicate with RAMIREZ.

22 15.    K.G. met lots of people online but said RAMIREZ was different from the others. K.G. said

23 RAMIREZ was considered "famous" on Animal Jam and she followed him around for a while before

24 they started communicating. RAMIREZ's screen handle at the time was "KingAllMighty." K.G. said

25 he was 24 when she met him, now 26, and it took her a few months of following him around in the game

26 before they became friends.

27 16.    K.G. said kids are allowed to have phones at school but they are not supposed to have them out

28 in class although most teachers don't care. K.G. texted with RAMIREZ daily on the phone using the

1   TextNow application loaded on her phone. They would get on the computer once a week to play the

2   game Transformice. RAMIREZ and K.G. used Transformice as a chat forum. They didn't really play

3   Transformice but texted on there as a way to hide their communications from K.G.'s parents.

4   17.   When asked what they texted about all the time K.G. replied music because RAMIREZ really

5   liked music, such as Nirvana and rap. K.G. said Transformice had a video link you can use to load up

6   music from YouTube to play during the game. K.G. said RAMIREZ was the manager at the 99cents

7   store in Glendale, Arizona. K.G. said RAMIREZ did not have a car. K.G. believed RAMIREZ finished

8   high school but did not go to college. RAMIREZ previously lived with his mom when she first met him

9   then he moved into his dad's apartment.

10  18.   K.G. said RAMIREZ sent one photo to her when he was going to the airport. Law enforcement

11  was able to recover the image sent by RAMIREZ to K.G. Although the image had poor resolution,

12  when compared to the Arizona Driver's License for Ivan Louis Sebastian RAMIREZ, they appear to be

13  the same individual.

14  19.   Around December of 2014, RAMIREZ started calling K.G. "baby" and "baby girl." RAMIREZ

15  sent her about $165 in e-gift cards for Christmas. They decided to be officially together around January

16  of 2015. K.G. thought they were together as boyfriend and girlfriend when their conversations started to

17  turn sexual. K.G. told RAMIREZ she was 11 when they met. Although K.G. is now 14, she said

18  RAMIREZ has known how old she has been the whole time they communicated. K.G. was secretive

19  about them being together and she estimated she fell in love with RAMIREZ in about March of 2015.

20  K.G. wasn't really sure who initiated their relationship. When asked what made her relationship with

21  friends different than her relationship with RAMIREZ, she said she communicated with RAMIREZ

22  more frequently and they talked about life instead of just games. K.G. said RAMIREZ and her would

23  say I love you; however, it was more as I love you like a brother or a sister because when they started

24  saying it RAMIREZ was still with his ex-girlfriend.

25  20.   In November of 2014, they started talking about sex in general. In about February of 2015, they

26  started talking about sex between the two of them. K.G. emailed RAMIREZ nude photos. K.G. sent a

27  nude picture first, and she said RAMIREZ did not pressure her to do it. K.G. felt like she was expected

28  to send it because they were boyfriend and girlfriend. K.G. said RAMIREZ never sent her a naked

1 | picture. K.G. said they talked about having sex with each other in a very loving way but occasionally it

2 | was more in a wanting way. RAMIREZ didn't have Internet for the first two months when he moved to

3 | his dad's house. During that time they were texting on the cell phone more often. K.G. was afraid her

4 | parents would find out they were communicating so they moved to the TextNow app. RAMIREZ had

5 | an iPhone 5. They had some problems getting pictures over the phone so they would exchange photos

6 | over email. K.G. partially recalled RAMIREZ's email as "l_ramirez'somenumber'@msn.com."

7 | 21.    Investigative steps determined that RAMIREZ was using the email account

8 | "l_ramirez2915@msn.com." It was also determined that IP addresses accessing the email account

9 | "l_ramirez2915@msn.com" were assigned to the CenturyLink account of Ivan Noriega at 6742 West

10 | Flynn Lane, Glendale, Arizona 85303.

11 | 22.    K.G. sent approximately 15 pictures to RAMIREZ over the course of their relationship. The

12 | photos depicted K.G. in various states of undress. K.G. claimed RAMIREZ only sent one photo to her,

13 | one from the airport, and he was fully clothed. K.G. said she didn't take any photos of just her privates

14 | alone. K.G. would cover her private areas on most of the photos. K.G. sent RAMIREZ a striptease

15 | video with her face and her private parts exposed on it about two months ago. RAMIREZ told her he

16 | liked the video, but she claimed she only ended up sending that one video. K.G. made the video because

17 | RAMIREZ had bought her a $50 gift card to Victoria Secret. She ordered something online and had it

18 | sent to her best friend's house. As a thank you for the gift card, K.G. sent RAMIREZ the video.

19 | 23.    Law enforcement was able to recover the video from K.G.'s computer. SA Brad Bilderback

20 | reviewed the video and provided the following description:

21 |         a. The video depicts K.G. in a lascivious exhibition of the genitalia. The video starts with K.G.

22 |             being fully clothed. K.G. then takes off her clothes while she is dancing. At one point, K.G.

23 |             rubs her breasts in a sexual way and near the end of the video K.G. turns her back to the camera

24 |             and bends over slightly to expose her genitalia. K.G. then runs one of her hands over her vagina

25 |             in a sexual manner. K.G. ends the video by saying "I love you" and makes a heart with both of

26 |             her hands.

27 | 24.    Once law enforcement was notified, an Agent, acting in an undercover capacity, started to

28 | communicate with RAMIREZ using K.G.'s accounts.

AFFIDAVIT IN SUPPORT OF CRIMINAL
COMPLAINT                                              16

1  25.  On August 6, 2015, Agent, acting as K.G., began a chat session with RAMIREZ. RAMIREZ
2  was upset with K.G. because she had not responded to him for almost two days.

3  26.  On August 7, 2015, RAMIREZ asks K.G. where she has been and why she hasn't been texting as
4  often. At one point, the Agent complained about K.G.'s mother and RAMIREZ replied, "Fuck yea I'm
5  gonna take you away from her and never give you back." RAMIREZ also said "I'm gonna be so stingy
6  with you. Never wanting to share you with friends and family. Whattt," and "Yea you can do it tho. A
7  happy life is waiting for us."

8  27.  On August 10, 2015, RAMIREZ starts the text conversation with, "You are a fucking terrible
9  support system." The Agent replied, "I'm 14. What do you expect?" RAMIREZ goes on to say how
10  K.G. sleeps soundly while he is in pain and agony; how she is a piece of shit and never is there for him
11  when something major happens to him like a promotion or injury. He also states how he can't go
12  through a month without being disappointed in her so how the fuck are they supposed to stand the test of
13  time. RAMIREZ later says, "Fuck you, wasting my time and money," and "3 years poured into a stupid
14  cunt, again. When will I learn."

15  28.  On August 11, 2015, RAMIREZ apologizes to K.G., saying he's sorry for letting her down as a
16  lover and a friend. He tells her he doesn't blame her for getting tired of waiting for them to begin a life
17  together and that he knew he was trying to get her too early before she experienced anything. He also
18  tells her he loves her and always will.

19  29.  On August 14, 2015, the Agent responds to RAMIREZ after three days of not responding to his
20  text messages. RAMIREZ is very relieved and talks about how much he loves K.G. and that he's never
21  letting her go again. During the conversation, the Agent asks the street location where RAMIREZ
22  works and he responds that the store is on 55th and Glendale Ave. RAMIREZ later tells K.G. that the
23  new manager position he has will allow him to see her for a week because it comes with one week of
24  paid vacation.

25  30.  On August 26, 2015, the Agent responds to RAMIREZ and states that K.G.'s mom took away
26  her phone and all electronics. The Agent also states that she found where her mom hid the phone and is
27  sneaking to respond to RAMIREZ. The following is a conversation between the Agent and RAMIREZ:

28       Agent: "She found the video I made for you."

AFFIDAVIT IN SUPPORT OF CRIMINAL          17
COMPLAINT

1   RAMIREZ: "Holy shit how"

2   RAMIREZ: "Hey"

3   Agent: "It was in the recycle bin of my cpu. I guess I didn't empty the bin and she was able to
4   view it. She's super pissed."

5   RAMIREZ: "I'm sorry, had I known someone was gonna find that I wouldn't have had you do it.
6   It was a very great gift but sorry it got you in hot water"

7   RAMIREZ: "What did ur dad say"

8   Agent: "Hopefully it's the gift that keeps on giving until we see each other! My dad is super
9   pissed too but mostly just disappointed in me. They don't know I sent it to anyone."

10   RAMIREZ: "Lol you already know how much I enjoyed that. Well you said I love you in it.
11   Surely that seemed like it was too someone. Lots of stressful shit K I wish"

12   RAMIREZ: "I love you so much babe"

13   31.   On August 28, 2015, the Agent stated that K.G.'s mom was out getting dinner and she had some
14   time to text. The Agent also stated that K.G. and her mom got in a huge fight the night before about her
15   phone. The following is a conversation between the Agent and RAMIREZ:

16   Agent: "I know. Her and my Dad are so worried that a video of me stripping naked is going to
17   get spread all over the Internet. I told them I never sent it. Now they have me worrying a little. You
18   promise to never show it to anyone right? I would die..."

19   RAMIREZ: "K[] I didn't send it to anyone. It's in my email and computer. You know I get
20   jealous at times. I don't want anyone else seeing what's mine. This isn't"

21   RAMIREZ: "a game to me, I'm not showing you off like ur some random chick I don't care
22   about. You think I would show random people pics of my future wife. I fucki"

23   RAMIREZ: "ng love you, you should know me better"

24   32.   On September 9, 2015, RAMIREZ sent seven text messages, including the following two:

25   RAMIREZ: "Missing you, love you. Need to fuck you fast and hard"

26   RAMIREZ: "Just came to ur vid, so sexy. I need you"

27   33.   On September 15, 2015, the following text exchange occurred between the Agent and
28   RAMIREZ:

AFFIDAVIT IN SUPPORT OF CRIMINAL
COMPLAINT

18

1    RAMIREZ: "Hugs and kisses to the love of my life. I hope you keep me in mind as I do with
2    you"

3    Agent: "God Louis this is horrible! She caught me trying to text you so she has kept my phone
4    in her purse ever since. I snuck it out just now while she sleeps so I can tell you I miss and love you so
5    much! I'm so afraid she'll wake up but it's worth it. I don't know how often I'll be able to do this but I
6    hope you don't give"

7    Agent: "Up on me. I love you so much!"

8    RAMIREZ: "I love you babygirl. Never gonna give up on us"

9    RAMIREZ: "Til the end of me. I miss you so goddamn much too"

10   Agent: "I saw your message about my vid. That was hot. What part of it do you like the most?
11   I'm still paranoid about it but I trust you."

12   RAMIREZ: "When you bent over and started rubbing ur pussy and walked to the camera with
13   nothing but your sweet, sweet body"

14   RAMIREZ: "You shouldn't be paranoid. I'm not gonna show off what's mine. I'm not a kid"

15   Agent: "I thought you would like that part the best. I can't wait for us to be together. Hugs tight
16   forever! And I know you won't show it off. Thank you and love you."

17   RAMIREZ: "Yea so I can take advantage of your body and abuse it all day. Getting me hard at
18   work"

19   Agent: "Hahaha! Sorry!"

20   34.    On December 2, 2015, FBI Special Agent Jimmie John Daniels conducted a wireless scan of the
21   area immediately to the west of the residence, 6742 West Flynn Lane, Glendale, Arizona, 85303.
22   Special Agent Daniels observed eight secured and two unsecured wireless access points in the
23   immediate area west of the residence.

24   35.    On December 1, 2015, a mail delivery request was made of the United States Postal Service, for
25   address 6742 West Flynn Lane, Glendale, Arizona, 85303. On December 3, 2015, the United States
26   Postal Service reported that individuals with the last name of Ramirez and Ivan A. Noriegg were
27   receiving mail at the residence.

28

36.     On December 1, 2015, a wages request was made of Arizona Department of Economic Security (DES) for Ivan Louis Sebastian RAMIREZ. DES reported wages from the 99 Cent Only Store for the third quarter of 2015.

37.     A review of Ivan Louis Sebastian RAMIREZ's Arizona Driver's License revealed an address of 6742 West Flynn, Glendale, Arizona, 85303.

38.     On January 6, 2016, a search warrant issued in the District of Arizona was executed at 6742 West Flynn Lane, Glendale, Arizona, 85303. During that search, law enforcement officers seized two computers and a cellular telephone belonging to RAMIREZ. RAMIREZ was informed of his *Miranda* rights, waived those rights, and consented to an interview. RAMIREZ told law enforcement officers that he met K.G. online and they started a relationship. RAMIREZ sent gift cards to K.G. for Victoria's Secrets and requested K.G. produce photos and the sexually explicit video previously known to law enforcement. RAMIREZ admitted to possessing the video and additional sexually explicit images of K.G. on his computer and in his e-mail. RAMIREZ confirmed to law enforcement that he knew K.G. was eleven years old when he met her and approximately thirteen years old when she sent the video.

//
//
//
//
//
//
//
//
//
//
//
//
//
//

AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

20

1

## CONCLUSION

2  39.    Based upon the above information, there is probable cause to believe that RAMIREZ has

3  violated 18 U.S.C. §§ 2251(a), 2252(a)(2), and 2252A(a)(2), which, among other things, make it a

4  federal crime for any person to induce a minor to engage in any sexually explicit conduct for the purpose

5  of producing any visual depiction of such conduct, or to knowingly possess or receive visual depictions

6  of minors engaged in sexually explicit conduct.

7

8  Respectfully submitted,

9

10  Approved to form

11  Jeremy Kelley

12  Assistant U.S. Attorney

L.H. Jones
Special Agent
Federal Bureau of Investigation

13  Subscribed and sworn before me this 6th day of January, 2016

14

15

16  Hon. Edmund F. Brennan
United States Magistrate Judge

17

18

19

20

21

22

23

24

25

26

27

28

AFFIDAVIT IN SUPPORT OF CRIMINAL
COMPLAINT                                        21